FILED & JUDGMENT ENTERED
Steven T. Salata

Nov 06 2015

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_/s/ George R. Hodges_
George R. Hodges
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
Western District of North Carolina
Asheville Division

| In Re: | ) | |
|---|---|---|
| | ) | Case no.    14-10150 |
| AVATARA SERVICES, LLC, | ) | |
| | ) | Chapter    11 |
| Debtor. | ) | |

## AMENDED ORDER CONFIRMING PLAN

THIS MATTER is before the Court on the duly scheduled confirmation hearing of the Debtor's Second Amended Plan of Reorganization, filed June 4, 2015 [Docket #149], and as supplemented via a document filed by the Debtor on July 20, 2015 [Docket #161] and also as amended orally at the hearing, held September 23, 2015, and memorialized in the Debtor's Confirmed Chapter 11 Plan attached hereto. Appearing for the Debtor in Possession at the hearing was its attorney, D. Rodney Kight, Jr. of Kight Law Office, PC. Also appearing was Alexandria Kenny, attorney for the Bankruptcy Administrator for the Western District of North Carolina, and Paul Taylor, Assistant United States Attorney, for the Internal Revenue Service and the Veterans Administration.

Based on the pleadings filed in this case and and the arguments of counsel at the hearing, the Court finds as follows:

1.    On June 4, 2015, the debtor/debtor-in-possession filed its First Amended Disclosure Statement [Docket #148] ("the disclosure statement") and Second Amended Plan

1

of Reorganization [Docket #149] ("the plan"). The Debtor filed a Supplement to the First Amended Disclosure Statement on July 20, 2015 [Docket #161] ("the supplement").

2.    On July 20, 2015, an order was entered conditionally approving the disclosure statement, setting a confirmation hearing for September 23, 2015 and setting September 15, 2015 as the last day for filing objections to the plan [Docket #162].

3.    A copy of the July 20, 2015 order conditionally approving the disclosure statement and setting confirmation hearing, the plan, the disclosure statement, the supplement, and a ballot for voting on the plan were timely forwarded to all creditors and other parties in interest.

4.    On September 23, 2015, the matter came on for hearing before the Court pursuant to 11 USC §1129. The above-referenced parties appeared. At the hearing the Debtor's attorney orally amended the Plan to include interest to the priority tax claims of the Internal Revenue Service.

5.    Ballots were properly provided to all 11 U.S.C. Section 502 claimants and/or interest holders and sufficient ballots were returned/filed to satisfy the confirmation requirements of accepting the plan pursuant to 11 U.S.C. Section 1126 and Section 1129.

6.    The plan complies with applicable provisions of Chapter 11 of the Code.

7.    The proponent of the plan complies with applicable provisions of the Code.

8.    The plan has been proposed in good faith and not by any means forbidden by law.

9.    Any payment made or to be made by the proponent, by the debtor or by a person issuing securities or acquiring property under the plan for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to

the case, have been approved by or is subject to the approval by the Court as reasonable.

10.   The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and the appointment to or continuance in such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

11.   The proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

12.   Any governmental regulatory commission with jurisdiction after confirmation of the plan over the rates of the debtor has approved any rate change provided for in the plan or such rate change is expressly conditioned on such approval.

13.   With respect to each impaired class of claims or interest, each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value as of the effective date of the plan that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date or if section 1111(b)(2) of the Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value as of the effective date of the plan that is not less than the value of such holder's interest in the estate's interest in the property that secures such claim.

14.   With respect to each class of claims or interest, such class has accepted the plan or such class is not impaired under the plan or confirmation is entered under Section 1129(b).

15.    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that: (a) with respect to the claim of a kind specified in Section 507(a)(1) or 507(a)(2) of the Code on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim; (b) with respect to a class of claims of a kind specified in Sections 507(a)(3), 507(a)(4), 507(a)(5) 507(a)(6) or 507(a)(7) of the Code, each holder of a claim of such class will receive, if such class has accepted the plan, deferred cash payments of a value as of the effective date of the plan equal to the allowed amount of such claim; or, if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and (c) with respect to a claim of a kind specified in Section 507(a)(8) of the Code, the holder of such claim will receive on account of such claim deferred cash payments over a period not exceeding five (5) years from the date of assessment of such claim of a value as of the effective date of the plan equal to the allowed amount of such claim.

16.    At least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider.

27.    Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor under the plan unless such liquidation or reorganization is proposed in the plan.

28.    All fees payable under Section 1930 of Tile 28 as determined by the Court at the hearing on confirmation of the plan have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

29.    If applicable, the plan provides for the continuation, after its effective date, of payment of all retiree benefits, if any, as that term is defined in Section 1114 of the Code at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the

4

Code at any time prior to confirmation of the plan for the duration of the period the debtor has obligated itself to provide such benefits.

30. Notwithstanding section 510(a) of the Code, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the Court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interest that is impaired under and has not accepted the plan.

31. For the purpose of 11 U.S.C. Sections 1129(a) and (b), if applicable, the condition that a plan be fair and equitable with respect to a class includes the following requirements: (a) with respect to a class of secured claims, the plan provides that the holders of such claims retain the lien securing such claims whether the property subject to such liens is retained by the debtor or transferred to another entity to the extent of the allowed amount of such claims in that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim of a value as of the effective date of the plan of at least the value of such holder's interest in the estate's interest in such property; (b) for the sale subject to Section 363(f) of the Code of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale and the treatment of such liens on proceeds under clause (i) or (iii) of such subparagraph or for the realization of such holders of the indubitable equivalent of such claims; (c) with respect to a class of unsecured claims, the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim or the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property; (d) with respect to a class of interest, the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value as of the effective date of the plan equal to the greatest of the allowed amount of any fixed liquidation preference to

which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property.

32. The debtor-in-possession is entitled to the discharge as described in the plan and confirmation order of the Court.

33. The Confirmed Chapter 11 Plan is attached to and incorporated into this confirmation order.

THEREFORE, based on the foregoing findings, the Court enters the following order:

IT IS ORDERED that the attached and incorporated plan is confirmed; the Chapter 11 discharge is entered discharging all debts pursuant to the plan; and evidences of indebtedness may be issued by the reorganized debtor reflecting any and all future indebtedness of the reorganized debtor and the Chapter 11 plan requirements. The Debtor shall serve a copy of this order and the confirmed plan on all parties in interest within 30 days.

This Order has been signed electronically.
The judge's signature and court's seal
appear at the top of the Order.

United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Asheville Division**

| | |
|---|---|
| In re: ) | |
| ) | Case no.    14-10150 |
| AVATARA SERVICES, LLC.,    ) | |
| ) | Chapter    11 |
| Debtor.    ) | |

**AMENDED CONFIRMED PLAN OF REORGANIZATION**

ARTICLE I—CLASSIFICATION AND TREATMENT OF CLAIMS

A.    UNCLASSIFIED CLAIMS

Certain types of Claims are not placed into voting classes. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class: Not applicable.

i.    Administrative Expenses and Fees

Description: Administrative expenses are claims for fees, costs, or expenses of administering the case which are allowed under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including all professional compensation requests pursuant to Sections 330 and 331 of the Code (the "Administrative Claims"). The Bankruptcy Code requires that all Administrative Claims must be paid on or before the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

Treatment: All Allowed Administrative Claims, shall be paid in Cash, in full, from available cash generated from the operation of Debtor's business, on the Confirmation Date of the Plan or at such later date as mutually agreed by the debtor and the administrative claimant(s).  However, Administrative Claims will only be paid upon Bankruptcy Court approval where such approval is required. The Debtor anticipates that it may incur the following categories of administrative expenses:

   a.    Costs. These could include, but are not limited to, filing fees, quarterly fees, copy and postage charges, deposition transcript charges, mediation fees, and other customary costs of a typical chapter 11 case.  The Debtor does not anticipate having to file any adversary proceedings. It may, however, need to litigate objections to claims, in which case it will incur typical litigation costs. It will also incur quarterly fees for the duration of the case. The Debtor is unable to project anticipated costs at this time because it does not yet know how many, if any, objections and/or adversary proceedings will be litigated. The Debtor's best estimate for quarterly fees is $1950 per quarter. Using 2 quarters from the date that the Debtor's First Amended Plan of Reorganization

("the amended plan") was filed as an approximation, the total comes to $3900. The Debtor intends to pay these as they come due throughout the case and does not anticipate a large administrative claim for quarterly fees at the time the case closes.

      b.    Attorney fees. The Debtor's attorney of record is D. Rodney Kight, Jr. of Kight Law Office, PC. The Debtor does not know how much it will incur in attorney fees because it does not know what, if any litigation and other matters it may have to pursue. It estimates that attorney fees will be approximately $2500-5000 per month for the duration of the case. This is a very "rough" estimate and may be more or less depending on the issues that arise in the case. The Debtor will be paying its attorneys throughout the case, subject to Court approval, and does not anticipate a large administrative claim for attorney fees at the time the case closes.

      c.    Other professionals. The Debtor is utilizing the services of Leonard Barto as Chief Restructuring Officer ("CRO") pursuant to an Order entered by the Court. The Debtor estimates that Mr. Barto will be paid approximately $3000-$5000 per month for the duration of the case, subject to court approval, and does not anticipate a large administrative claim for CRO fees at the time the case closes.

ii.    Priority Tax Claims Under Section 507(a)(8)

Description:  Priority tax claims ("Priority Tax Claims") are certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. Debtor owes the following priority tax claims:

      a.    Internal Revenue Service ("IRS"): Approximately $191,790.71 in priority claims. Pursuant to an oral amendment by the debtor made at the confirmation hearing, the IRS will receive interest on its claim at 3.00%.

      b.    California Franchise Tax Board: $15,553.65 in priority claims.

      c.    Kansas Department of Revenue: $5279.13 in priority claims.

      e.    California Employment Development Department: $4066.53 in priority claims.

      f.    Indiana Department of Revenue: $5164.92 in priority claims.

      g.    Missouri Department of Employment Security: $5229.61 in priority claims.

      h.    Ohio Attorney General: $1432.71 in priority claims.

      i.    Ohio Department of Taxation: $289.66 in priority claims.

      j.    Ohio Bureau of Workers Compensation: $14,916.14 in priority claims.

    h.    State of California: $1102.41 in priority claims.

    i.    Tennessee Department of Labor: $21,501.20 in priority claims.

The Debtor anticipates that priority tax claims will total approximately $266,326.67.

Treatment: The Bankruptcy Code requires that each holder of a Priority Tax Claim receive cash installment payments equal to the allowed amount of such claim over a period not exceeding five years from the date of the filing of the bankruptcy petition. All allowed Priority Tax Claims shall be paid in Cash at the time they are Allowed pursuant to a Final Order from available Cash, but only if all Allowed Administrative Claims and other Allowed Priority Non-Tax Claims having priority under Section 507(a) have been paid in full. The Debtor estimates that payments on priority tax claims under this section will be paid monthly beginning September 2015 and shall continue for 43 total months to satisfy the requirement that they be paid in full within 60 months of the filing date, or until the claims are paid in full, whichever first occurs. The Debtor will pay each priority tax claimant under this section a monthly payment equal to 1/43 of its allowed claim.

Statement regarding filing of tax returns and compliance with payment of tax liabilities: The Debtor has filed all tax returns due through the date of this plan. It obtained an extension of time to file its 2014 tax returns. The Debtor will continue to file timely returns and pay any tax liabilities that come due.

    Impairment: This class is impaired.

B.    CLASSIFIED CLAIMS

i.    Class 1- Secured claim of Capital Stack LLC % Colonial Funding, LLC ("Capital Stack")

    Description: Capital Stack asserts a claim in the amount of $75,364.43 based on a proof of claim filed on August 15, 2014 (claim #35) secured by a first position lien in the debtor's inventory, accounts, and equipment by virtue of a UCC financing statement filed on March 29, 2012 in Ohio (document number OH00157113532) and successive filings. The Debtor disputes this amount. Additionally, the proof of claim was filed after the claims bar date of July 29, 2014. The Debtor reserves the right to object to any claim filed by Capital Stack in excess of $50,238.03, which is the amount scheduled in the Debtor's petition.

    Treatment: This claim shall be allowed up to the value of the collateral securing the indebtedness, which in this case is in excess of the claim amount. Accordingly, the allowed claim will be paid in full, with interest at 3.250%, amortized over 36 months. Payments will be monthly beginning October, 2015 and, based on the claim amount, will be $2200.00.

Page 3 of 12

   Adequate Protection: The debtor will continue to make monthly adequate protection payments each month through confirmation of the amended plan equal to interest at 3.250% until the plan is confirmed. Adequate protection payments shall be $136.06.

   Cash Collateral: As of the date of this document, there is an Order in place authorizing the Debtor to use Capital Stack's cash collateral. Upon confirmation, the Debtor's Confirmed Plan will supersede all prior Orders and the Debtor will be authorized to use cash collateral in the usual course of business so long as it remains in compliance with its obligations to Capital Stack under the provisions of the confirmed plan.

   Impairment:  This claim is impaired.

ii.     Class 2- General Unsecured Claims under $150,000.00.

Description:  Class 2 consists of all creditors holding allowed general unsecured claims less than $150,000.00.

Treatment:  Class 2 claimants shall be paid $6174.00 per quarter for 20 quarters.

Each holder of an allowed Class 2 claim shall be paid its pro rata portion of $123,480.00. Payments totaling $6174.00 will be made quarterly for 20 quarters beginning the third quarter of 2016. Based on the anticipated claims, the debtor estimates that Class 3 claimants will receive approximately 22% of their claimed amounts.

Allowance of claims: Claims will be allowed as set forth in the petition unless a claimant files a proof of claim, in which case the claim shall be allowed as set forth in the proof of claim. The Debtor reserves the right to object to any claims, including claims set forth in the petition. In the event that a claim is designated as "disputed" in the petition and no proof of claim is filed then such claim shall not be allowed and shall not receive a distribution.

Impairment:  Class 2 is impaired.

iii.    Class 3- General Unsecured Claims in excess of $150,000.00.

Description:  Class 3 consists of all creditors holding allowed general unsecured claims in excess of $150,000.00.

Treatment:  Class 3 claimants shall be paid $7140.00 per quarter for 18 quarters.

Each holder of an allowed Class 3 claim shall be paid its pro rata portion of $128,520.00. Payments totaling $7140.00 will be made quarterly for 18 quarters beginning the first quarter of 2016. Based on the anticipated claims, the debtor estimates that Class 3 claimants will receive approximately 22% of their claimed amounts.

Allowance of claims: Claims will be allowed as set forth in the petition unless a claimant files a proof of claim, in which case the claim shall be allowed as set forth in the proof of claim. The Debtor reserves the right to object to any claims, including claims set forth in the petition. In the event that a claim is designated as "disputed" in the petition and no proof of claim is filed then such claim shall not be allowed and shall not receive a distribution.

Impairment:   Class 3 is impaired.

iv.   Class 4- Leases and Executory Contracts

Description:   Class 4 consists of leases and executory contracts. The Debtor has the following leases and executory contracts:

  a. DCXL, Inc. db/a ExcelHR: This is a co-employment and payroll service contract. This contract was terminated effective May, 2014. To the extent that the executory contract has any binding effect the Debtor hereby rejects it.

  b. FIRC Haywood Park, LLC: This is a commercial lease agreement for office space. The Debtor has vacated the premises and will reject this lease.

  c. SBS Leasing: This is a lease and maintenance agreement for two copier/printer machines. The Debtor will reject this executory contract.

  d. Team Funding Solutions ("TFS"): This is a lease agreement for equipment that the Debtor uses in its operations. An agreement was reached between the Debtor and TFS on March 19, 2014, which the Debtor will assume.

  f. Jason Loken ("Loken"): This is an agreement to purchase certain items of equipment necessary for the debtor's operation in Washington State. The debtor obtained Court approval to enter into this executory contract and it will be assumed.

  g. Additionally, the Debtor has several maintenance/ service contracts which are a substantial portion of the Debtor's annual revenues. The Debtor will assume each of these executory contracts. A complete listing of the co-parties to the maintenance agreements, which is part of its core business, is attached to the Debtor's First Amended Disclosure Statement.

v.   Class 5—Equity Security Holders

Description:   This Class consists of the claims of all equity interests ("Equity Interests") in the Debtor. The Debtor has the following "Equity Interests":

   a.   Patti Jackson (51% ownership). Insider Patti Jackson is the surviving spouse of Larry Jackson, the original principal of the company. Larry Jackson was a

service disabled veteran and able to obtain preference in that regard on certain government contract. His status passes on to Patti Jackson pursuant to pursuant to 38 CFR 74.1. In an amendment to the Debtor's operating agreement, dated December 15, 2012, Patti Jackson stepped both into Jackson's ownership and management position upon his passing. Patti Jackson has worked continuously with and for the Debtor and Jackson for years and is intimately involved with its operations. She has been following this case since its inception and assisted with bringing it to confirmation upon Larry Jackson's passing. She will be paid a salary of $130,000 annually, which is based on Larry Jackson's salary.

      b.    Samuel Cody (49% ownership). Insider Samuel Cody ("Cody") was performing contract capture, bidding, and operations management at the time that the case was filed. He voluntarily agreed to cease his work for the Debtor at the time that Leonard Barto, the present Chief Restructuring Officer ("CRO") was appointed by the Court. Based on the recommendations of the CRO, the Debtor anticipates that Samuel Cody will work for the Debtor and be paid commission of 10% based on new revenue sources which he helps obtain for the Debtor.

The Debtor notes that Cody is obligated to the company in the amount of $184,654.00 based on prior tax returns. Although Cody did not ever formally borrow money from the Debtor, based on accounting practices and professional advice it appears that he took compensation in the form of draws in excess of his basis in the company, thus generating a technical "loan" to him from the company. Cody is insolvent and currently unemployed. He agrees to make payments to the company in the amount of $500.00 per month for 60 months. After these payments are completed the balance of the loan will remain on the company's books. These payments will be earmarked for, and paid to, the Class 2 and 3 claimants. The Debtor believes that this is in the best interest of the Debtor's claimants because it avoids the necessity of litigation and its consequent costs. Additionally, given that Cody is insolvent it provides a stream of income rather than a costly and most likely unfruitful pursuit of a debt.

Treatment: The Equity Security Holders shall retain their equity interests.

### ARTICLE II—MEANS FOR EXECUTION OF THE PLAN

The plan will be executed by the Debtor's ongoing revenue stream from its business activity. A copy of the debtor's budget is attached to the plan as an exhibit.

### ARTICLE III—OWNERSHIP

The equity holders shall retain their equity interests. See Article II(B)(v) ("Class 4- Equity Security Holders"), above.

### ARTICLE IV—LIQUIDATION ANALYSIS

The liquidation value figure is derived by taking the total value of the estate's unencumbered assets. The total value of the Debtor's assets as of the filing date of March 21, 2014 was $422,707.39. These assets are primarily from 3 categories: (1) Accounts and accounts receivable, (2) Office equipment and furnishings, and (3) Vehicles and equipment used in the performance of its contracts. The Debtor does not own real estate.

The Debtor is obligated to one secured claimant. This claimant, the Class 1 Claimant, filed a claim in the amount of $75,364.43 secured by all of the Debtor's assets. This means that a sale of the assets (not including the uncollectible Cody "loan") would theoretically generate $347,342.96 in net proceeds. However, the accounts are not all collectible and change from day to day. The office equipment is difficult to sell and general office assets usually sell for "pennies on the dollar" at auctions. Some of the Debtor's equipment and vehicles may sell for a reasonable amount of money; however, the equipment is heavily used and equipment of this type is in abundance on the second-hand market. Additionally, the equipment is located in several sites around the United States. Marshaling and disposing of it would be costly from an administrative standpoint. For these reasons, plus the nature of bulk-sale auctions and the associated costs, the Debtor does not believe that the liquidation value of the estate is anywhere near the "on paper" value of $347,342.96. The Debtor owes priority claims to governmental entities in the claimed amount of $266,326.67. After factoring costs and actual collected proceeds, the Debtor is unlikely to generate sufficient proceeds from a liquidation to pay much of a dividend to these claimants, much less pay them in full. In a liquidation scenario the general unsecured claimants will almost certainly receive nothing. For these reasons, the Debtor submits that a reorganization is in the best interests of the general unsecured claimants.

## ARTICLE V—OTHER PLAN PROVISIONS

A. EFFECTIVE DATE:

The Plan will become effective on the Effective Date, which is 30 days after the Order of confirmation becomes a Final Order.

B. MODIFICATION

The Debtor may alter, amend, or modify the Plan at any time prior to the date when the Plan is confirmed and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

C. VESTING OF PROPERTY IN THE DEBTOR

Except as may otherwise be set forth herein, upon the Effective Date of the Plan, all property dealt with by the Plan and otherwise in the Debtor's Estate shall vest in the Debtor.

D. DEFAULT AND CREDITOR RISK

The Debtor shall be in default if it fails to make any required payment within 30 days after being sent written notice. Upon default, jurisdiction for any legal proceeding shall reside in the State of North Carolina. Claimants' risk under the terms of the plan is low. The Debtor is a going concern that has had substantial revenues for years. Based on the Plan payments and the Debtor's projection, it will have a net monthly income that will serve as a "cushion" to assist with any future unforeseen cash flow shortages.

E.    VOIDABLE TRANSFERS

The Debtor does not anticipate that there will be any avoidable transfers on which to pursue recovery. The following is a list of the transfers set forth in Questions 3(b) and 3(c) and Questions 10(a) and 10(b) of the Debtor's Statement of Financial Affairs, which was attached to its voluntary petition: None.

F.    VOTING REQUIREMENTS

The goal of the voting process is to satisfy the Bankruptcy Code's requirement for a minimum level of creditor support for the plan. That minimum level consists of having at least one impaired accepting class of claims, with acceptance determined by "yes" votes cast by creditors who hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims who vote in the class, excluding the votes of insiders. For the creditor classes, the Bankruptcy Code provides that only holders of allowed claims are entitled to vote on a plan, consisting of filed and, to the extent not filed, scheduled claims. Filed claims are deemed allowed as filed unless they are the subject of an objection or have been withdrawn, disallowed or otherwise adjusted by court order. For scheduled claims, the schedules of liabilities constitute prima facie evidence of the validity and amount of the claims, which can be relied on by creditors without the necessity of filing a proof of claim.

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by section 1129(b) of the Bankruptcy Code. A plan that binds non-accepting classes is commonly referred to as a cram down plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of section 1129(a)(8) of the Bankruptcy Code, does not discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan. You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.

G.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least

as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

H.   OBJECTION TO CLAIMS

The debtor reserves the right to file separate objections to claims that it disputes, including those listed in schedules D, E, F, and/or G, regardless of whether they are listed as "Disputed" or not.

I.   TAX CONSEQUENCES OF PLAN

Creditors and equity interest holders concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.

Subject to the limitations noted below, the following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan relevant to holders of Claims entitled to vote with respect to adoption of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Revenue Code"), in effect on the date of this Disclosure Statement, on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, and on judicial and administrative interpretations thereof available on or before such date. All of the foregoing is subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS or opinion of counsel has been sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable, including to any particular Claim holder or Equity Interest. The tax treatment of a holder of a Claim or a Claim of Interest will vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or to a holder of a Claim or an Equity Interest. This summary does not address tax considerations applicable to holders that may be subject to special tax rules.

No statement in this Disclosure Statement should be construed as legal or tax advice. The Debtors and their Professionals do not assume any responsibility or liability for tax consequences that the holder of a Claim or an Equity Interest may incur as a result of the treatment afforded a Claim or Equity Interest under the Plan.

Page 9 of 12

EACH HOLDER OF A CLAIM OR AN INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE PLAN, INCLUDING ANY APPLICABLE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE OF AN INDEPENDENT TAX ADVISOR BASED ON THEIR PARTICULAR CIRCUMSTANCES.

a.    Federal Tax Consequences to the Debtor

The Debtor is a limited liability company ("LLC"). As an LLC, the Debtor is a pass through entity for federal income tax purposes. As a result, any income tax liabilities or other attributes arising as a result of or in connection with the execution of the Plan may be paid or received by the Debtor; however, they also may pass through to the Debtor's principals.

Any of the Debtor's debts that are not paid in full under the Plan or that are forgiven might be deemed partially discharged for tax purposes. If the Debtor were unable to pay creditors in full as set forth in the Plan, it would have to recognize cancellation of indebtedness ("COD") income in an amount equal to any effectively discharged debt, to the extent the accrual of such debt has generated a tax deductible expense for, or was capitalized and included in the tax basis of assets of, the Debtor. Any such income (a) would likely be excluded from the Debtor's taxable income under Section 108(a)(1)(A) of the Code, (b) may be passed through to the Members, and (c) may not generate increases in the Members' basis in their stock under Section 1367 of the Revenue Code. At the close of any year in which a forgiveness of any debt occurs, the Debtor would be required to reduce certain tax attributes by an amount up to the COD income excluded from taxable income.

b.    Federal Tax Consequences to Holders of Claims or Equity Interests

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims or Equity Interests will depend on, among other things, the consideration to be received by the Claim holder, whether the Claim or Interest holder reports income on the accrual or cash method, whether the Claim or Interest holder receives distributions under the Plan in more than one taxable year, and whether the Claim holder has previously taken any bad debt deduction or a worthless security deduction with respect to its Claim.

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the

Claim. Any gain or loss recognized may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized. The holder's amount realized should equal the sum of the Cash and the fair market value of any other property received by the holder under the Plan, less the amount (if any) treated as interest, as discussed below.

Because certain holders of Allowed Claims may receive Cash distributions after the Effective Date, the imputed interest provisions of the Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

Holders of Allowed Claims will recognize ordinary income to the extent that they receive Cash or property that is allocable to accrued but unpaid interest that the holder has not yet included in its income. If an Allowed Claim includes interest, and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest.  Holders of Allowed Claims should consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

c.      Backup Withholding Tax and Information Reporting Requirements

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate Claim holders. Information reporting generally will apply to payments under the Plan, other than payments to an exempt recipient. The Debtor may be required to withhold backup withholding tax from any payments made under the Plan, other than payments to an exempt recipient, if such Claim holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR OR EQUITY INTEREST HOLDER. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

J.   COMPANY NAME and ADDRESS

The Debtor has received complaints that its name is confusing. It is variously registered and doing business as Avartara Services, LLC and Avatara Services, LLC. Management will exercise its best business efforts to clear up any inconsistencies with the official names and proceed in the future with one consistent name. Additionally, all correspondence to the Debtor should be sent to the following address:

Avatara, LLC
22C New Leicester Hwy, #134
Asheville, NC 28806

H.   DISCHARGE

Pursuant to 11 USC Section 1141, any and all amounts due by the Debtor/Debtor-in-possession shall be discharged upon completion of the plan payments.